# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO


CREATIVE GIFTS, INC.,
FASCINATIONS TOYS & GIFTS, INC.,
and WILLIAM HONES,

        **Plaintiffs,**                        **CIV. No. 97-1266 LH/WWD**

v.

UFO,
MICHAEL SHERLOCK,
and KAREN SHERLOCK,

        **Defendants.**


## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]


## FINDINGS OF FACT

### *I.  Factual Background*

    1   Plaintiff Creative Gifts, Inc. ("Creative Gifts") is a corporation organized and existing under the laws of the State of Washington, and is located and doing business at 17953 Marine View Drive, Seattle, Washington 98166.  (J)

    2.   Plaintiff Fascinations Toys and Gifts, Inc. ("Fascinations") is a corporation organized and existing under the laws of the State of Washington, and is located and doing business at 19224 Des Moines Way So., Suite 100, Seattle, Washington 98148.  (J)

---

[1] Findings of Fact and Conclusions of Law in some instances are followed by a parenthetical.  "(J)" indicates that the preceding Finding or Conclusion was jointly agreed upon by the parties (See Docket No.158).  "(SF)" indicates that the preceding Finding or Conclusion was a Stipulated Fact contained in the Pre-Trial Order, Appendix A (Docket No.  153).

3.  Plaintiff William Hones ("Hones") is an individual residing at 17953 Marine View Drive, Seattle, Washington 98166, and at all relevant times has been vice president of Creative Gifts and president of Fascinations.  (J)

4.  Defendant UFO is located and doing business in Kingston, New Mexico.  (J)

5.  Defendant Michael Sherlock is a natural person residing in Kingston, New Mexico, at all relevant times has been involved in the running of UFO, and is currently one of the Managing Directors of UFO.  (J)

6.  Defendant Karen Sherlock is a natural person residing in Kingston, New Mexico,  at all relevant times has been involved in the running of UFO, and is currently one of the Managing Directors of UFO.  (J)

7.  Since June 1994, Creative Gifts has marketed magnetic levitating devices, sometimes referred to as anti-gravity tops, through mail order catalogs and various retailers.  Anti-gravity tops are novelty items that include a magnetic floating top and an associated magnetic base.  (J)

8.  Since 1994, Plaintiffs have continuously used the LEVITRON trademark (hereinafter "the mark")  on its anti-gravity tops.  Plaintiffs and their distributors and licensees have sold approximately 500,000 anti-gravity tops since June 1994 in the United States and throughout the world.

9.  All anti-gravity tops that have been sold by Plaintiffs have been manufactured by sources outside of the United States.  (J)

10. In the United States, at the time of trial, anti-gravity tops could be obtained from Creative Gifts and its licensees and distributers.

11.  Defendants Michael and Karen Sherlock were first introduced to Creative Gifts' anti-

gravity top in September 1995 through a mail-order catalog.  (SF)

12.  In December 1995, Defendants contacted Plaintiffs and expressed their desire to become a distribution company for Plaintiffs' anti-gravity tops and related products.  (SF)

13.  From December 1995 through August 1997, Defendants purchased from Plaintiffs and resold approximately 12,000 anti-gravity tops, each with an instructional videotape created, manufactured, and sold by Defendants and approved by Plaintiffs.  Defendants also sold other products related to the anti-gravity top.  (SF)

14.  This instructional and informational video is entitled "Secrets of the Levitron:  The Art of Levitation" .  It was sold with Plaintiffs' approval and permission and featured Williams Hones demonstrating the operation of Plaintiffs' anti-gravity top.  (SF)

15.  A Federal Trademark Registration No. 1,896,265, for "LEVITRON and Design", was issued to Creative Gifts by the United States Patent and Trademark Office on May 30, 1995 ("the '265 Registration").  In July 1997, Creative Gifts applied for an amendment to change the registered "LEVITRON and Design" trademark from a word-design mark to a word mark with the simple block letters "LEVITRON."   The application for amendment was signed by William Hones on or about June 20, 1997 and filed in the United States Patent and Trademark Office on July 1, 1997.  (J)

16.  The United States Patent and Trademark Office granted the amendment to the '265 Registration and it was amended from "LEVITRON and Design" to "LEVITRON" in block letters.  During the pendency of the application for amendment, Plaintiffs did not inform the United States Patent and Trademark Office of the domain name dispute or of this lawsuit with Defendants.  (J)

17.  The '265 Registration, now amended, is in full force and effect and has an effective registration date of May 30, 1995.

18.  Plaintiff Creative Gifts is the exclusive owner of the mark; with the exception of the levitron.com domain name used by Defendants, there are no known third party uses of the mark.

19.  In or about October 1996, Defendants decided to advertise Plaintiffs' anti-gravity tops and related products on the Internet, informed Plaintiffs that they were planning a website entitled levitron.com and requested Plaintiffs' permission to use Plaintiffs' mark as a domain name.

20.  Plaintiffs and Defendants orally agreed that Defendants could use the mark as a domain name for a website.  The only use for the website mentioned was that Defendants would offer for sale  products obtained from Plaintiffs, and other related products.

21.  Each of the products and services offered at the levitron.com website by Defendants was offered for sale  by Defendants with Plaintiffs' knowledge.  All of the products except the "Secrets of the Levitron" video and a science paper originated from Plaintiffs.  Plaintiffs approved the "Secrets of the Levitron" video, the science paper, and all services provided by the Defendants.

22.  There was an oral agreement between Plaintiffs and Defendants in which Plaintiffs agreed to permit Defendants to register the domain name "levitron.com" in Defendants' name.

23.  The oral agreement regarding ownership of the levitron.com domain name was open ended as to duration with no definite time for termination.  (J)

24.  Defendants created a website utilizing levitron.com as the domain name.   Defendants created and designed the website themselves, without participation from any contractors other

than Keith Rowland, a webmaster, who merely "pasted up" that which was provided by Defendants. Defendants paid Mr. Rowland approximately $1,500 for his services in this regard. (J)

25. In October 1996, Defendants registered the levitron.com domain name with Network Solutions for approximately $100. Defendants spent a large amount of time in the writing, photography, design and construction of the website. From October 1996 until the present time, Defendants have been the registered owners of the levitron.com domain name. (J)

26. While each party drafted an agreement for consideration and execution by the other, no written agreement was ever executed memorializing the above-mentioned oral agreement entered into between Plaintiffs and Defendants. (J)

27. Defendants' first website advertising was on the Art Bell website in July 1996.

28. Defendants paid all costs for advertising the anti-gravity top on the Art Bell Show. Plaintiffs' company names were never mentioned on the Art Bell Show. One of the largest paid, continuous, public exposures of the anti-gravity top was on the Art Bell Show. (SF)

29. Defendants identified the Art Bell Show as an excellent media for advertising and promoting the anti-gravity top. Art Bell personally approved of the product to be advertised on his show; the "product" was comprised of Plaintiffs' anti-gravity top and Defendants' instructional and informational video tape entitled "Secrets of the Levitron: The Art of Levitation." Defendants advertised on the Art Bell Show for more than one year. (SF)

30. Defendants spent approximately $140,000 to promote their retail sales of the anti-gravity top and related products. Of this amount, approximately $132,000 was spent in advertising on the Art Bell radio shows. As a result of this advertising, Defendants sold

approximately $420,000 worth of anti-gravity tops and related products. (SF)

31. Defendants sold approximately 12,000 anti-gravity tops supplied to them by Plaintiffs from October 1996 to August 1997.

32. In December 1996, Defendants fell approximately $10,000 behind in their payments to Plaintiff Fascinations on invoices for products and have not yet paid this debt.

33. Beginning about February 1, 1997, Defendants offered and sold various products related to the Plaintiffs' anti-gravity top.

34. Defendants took steps to make sure every aspect of the products they sold, including products originating from Plaintiffs, were of the highest quality. (J)

35. All products sold by Defendants at the levitron.com website were of the highest quality and Defendants had very few returns. (J)

36. In August 1997, Defendants published the "Hidden History of the Levitron" article (the "Hidden History" article) at the levitron.com website. In the "Hidden History" article, Defendants stated that, as of August 24, 1997, they had suspended all sales of Plaintiffs' "Levitrons, Super Levitrons, and Levitron Perpetuators" for the reasons set forth in the article. Since August 28, 1997, Defendants have been and are currently offering for sale their "Secrets of the Levitron" video and a science paper from Sir Michael Berry as well as other products and services on the levitron.com website. Defendants have also informed the thousands of visitors to the website of Defendants' future plans to retail their own anti-gravity top. (SF)

37. On August 28, 1997, Plaintiffs' attorneys sent a letter to Defendants requesting the voluntary transfer of the levitron.com domain name to Creative Gifts, Inc., contending that use of the domain name violated the trademark rights of Plaintiffs and that continued use of the domain

name would cause confusion, mistake and deception, and constituted trademark infringement, unfair competition and misappropriation. At this point, Plaintiffs withdrew their permissive use of the domain name.

38. Defendants refused to relinquish the levitron.com domain name and have refused to cease all use of the domain name.

39. From the time the levitron.com website was initially posted until approximately August 1997, Plaintiffs periodically reviewed Defendants' activities with respect to Defendants' authorized use of Plaintiffs' mark as a domain name and on the levitron.com website. Except for products originating from Plaintiffs, Defendants sent all products to Plaintiffs for review and kept Plaintiffs informed of their related promotional activities.

40. Prior to publication of the "Hidden History" article, Plaintiffs reviewed Defendants' website and never provided any negative comments or suggested changes because Plaintiffs approved of the website content. Defendants kept Plaintiffs informed of their website activities.

41. By filing this lawsuit, Plaintiffs have taken steps to curtail the improper or unauthorized use of the mark by Defendants.

42. In late August 1997, in a paid radio advertisement on one of the Art Bell shows, Defendants stated that they had chosen to shut down their entire business until the matters set forth in the "Hidden History" article were resolved. One reason that Defendants made that statement was to avoid the embarrassment of the fact that they had been cut off from their source of supply by Plaintiff Fascinations. (SF)

43. Defendants have investigated various sources of anti-gravity tops since Plaintiffs discontinued shipping any further anti-gravity tops to Defendants in July 1997. (SF)

44.  On or about August 16 or 17, 1997, prior to Defendants' publication of the "Hidden History" article, Defendants were contacted by Mr. Kang, a representative from TheBoo Company Ltd., a Korean company, regarding potentially forming a business relationship to produce anti-gravity tops.  This company was planning to enter the United States toy market with an anti-gravity top and was looking for a United States partner.  (SF)

45.  In or about October 1997, Defendants produced a proposal video demonstrating numerous embodiments of an anti-gravity top.  Packaging for it had the mark prominently displayed.  (SF)

46.  After this lawsuit commenced, unsolicited,  Defendants received  a prototype of a UFO-type anti-gravity top, CAD drawings of other proposed anti-gravity top designs, and proposed graphics for a UFO-anti-gravity top box from TheBoo Company Ltd.   Defendants produced a videotape showing TheBoo Company Ltd.'s proposed designs and sent the videotape to Michael Vary and Roy Harrigan.  (SF)

47.  Prior to the filing of the instant lawsuit, Defendants intended to license Roy Harrigan's patent for an anti-gravity top, and Defendants had numerous discussions with Mr. Vary, Roy Harrigan's attorney, regarding licensing the rights to Mr. Harrigan's anti-gravity top patent.  Defendants' discussions with TheBoo Company Ltd., Mr. Harrigan and Mr. Vary have not resulted in any business relationship to date.  (SF)

48.  Plaintiffs are currently  the only sellers of an anti-gravity top in the United States, except for the fact that a similar device may be obtained by ordering it on the Internet from a Korean manufacturer who is not currently affiliated with Plaintiffs.

49.  If Defendants can obtain financing, they intend to offer anti-gravity tops for sale

through the levitron.com website.  (SF)


A.  *Facts Relating to the Likelihood of Confusion[2] Issue*

50.  The registered mark of Plaintiff and the domain name "levitron.com" contain the same word, which of course, sound the same.   Mr. Sherlock testified that use of this term by both parties will create confusion and in fact, has already created actual confusion. (Exhibit P7, M. Sherlock deposition at pp. 300-304.)

51.  It is inevitable that confusion will result among consumers who are seeking Plaintiffs' products  by searching for its trademark as a domain name on the Internet, as long as the domain name remains in the possession of Defendants.

52.  Given the relatively inexpensive nature of Plaintiffs' anti-gravity top, it is more likely to be confused with another similar item, intended to be  marketed in the future by Defendants, than would more expensive items that are chosen more carefully.

53.  Confusion as to the source of  Plaintiffs' anti-gravity tops has arisen from Defendants' and Plaintiffs' concurrent use of Plaintiffs' mark since the August 28, 1997 letter.

54.  Defendants' initial and continued disparagement of Plaintiffs and Plaintiffs' anti-gravity top in the "Hidden History" article and in updates of the article posted on the levitron.com

---

[2]  In determining whether, under all the circumstances, there is a likelihood of confusion, the Court has considered the factors set out in the Restatement of Torts § 729 (1938), as mentioned in the case of *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 940 (10th Cir. 1983):  (a)  degree of similarity between the designation and the trademark or trade name in (i)  appearance;  (ii)  pronunciation of the words used; (iii) verbal translation of the pictures or designs involved;  (iv)  suggestion;   (b)  the intent of the actor in adopting the designation;  (c)  the relation in use and manner of marketing between the goods or services marketed by the actor and those marketed by the other;  (d)  the degree of care likely to be exercised by purchasers.  These factors are not exhaustive and no single factor is determinative.

website continues to create confusion.

55.  As non-owners of the trademark, Defendants' use of it as a domain name, contributes to the likelihood of confusion.

56.  If Defendants were to sell anti-gravity tops in the same market as that used by Plaintiffs, under the same mark, using the same marketing channels, it would lead to further consumer confusion.

57.  There is a likelihood of confusion between Plaintiffs' registered mark and Defendants' use of "levitron.com" on the Internet.

### B.  Facts Relating to Potential Defenses

#### (1)  Descriptiveness

58.  Williams Hones coined the word "levitron" for use as a trademark for a magnetically levitated anti-gravity top developed by him and his father, Edward Hones.  There is no known literal or dictionary meaning for this word in the English language.

59.  Because the U.S. Patent and Trademark Office will not register a descriptive trademark on the principal register, this is *prima facie* evidence that the Levitron Mark is not descriptive.

60.  The term "levitron" would not be commonly understood to mean an instrument that levitates a top or a levitating top itself.

61.  The term "levitron" is not a common, descriptive name of an anti-gravity device.

62. Defendants sold approximately 12,000 anti-gravity tops supplied to them by Plaintiffs from October 1996 to August 1997. Of these, approximately 1,500 anti-gravity tops were purchased by third parties by way of mail-in orders sent to Defendants and approximately10,000 were purchased via phone orders received by Defendants.

63. Defendants reviewed approximately 80% of the mail-in orders that they received, or roughly 1,200 orders. Of these, Defendants identified 931 orders that they contend indicate generic use of the word "levitron". These 931 orders comprise Exhibits DR, DS and DT. The 931 orders constitute 7% of the 12,000 total orders received by Defendants, and 62% of the 1,500 written orders received by Defendants, but represent only a negligible percentage of the approximately 500,000 anti-gravity tops that have been sold by Plaintiffs.

64. All communications of consumers with Defendants, via the mail, the Internet and/or following exposure to the Art Bell Radio Show, had to do with the purchase of Plaintiffs' products or products related to Plaintiffs' products. Consequently use of the word "levitron" was related to Plaintiffs' products.

65. Exhibit 24 is an exhibit offered by Plaintiffs in rebuttal to Defendants' Exhibits DR, DS and DT. Exhibit 24 is comprised of shipping orders sent to Defendants from approximately October 96-August 97, which were omitted from Defendants' Exhibits DR, DS and DT. Plaintiffs contend that Exhibit 24 illustrates that use of the word "levitron" is not a generic usage by the consuming public, but rather is a strong indicator of source.

66. The Court has reviewed Exhibits DR, DS and DT, and finds that they constitute inadequate proof to establish that the registered mark has become a generic name or that it has

been abandoned; this proof is numerically insignificant in light of overall sales, and is not based on purchaser testimony, consumer surveys, trade journals, or other more commonly accepted and probative types of evidence. *See Magic Wand, Inc. v. RDB, Inc.,* 940 F.2d 648 (Fed. Cir.1991).

67.  There is inadequate proof to establish that the relevant public understands the mark to be a generic name for anti-gravity devices.

68.  The Court has reviewed Exhibits DR, DS and DT as well as rebuttal Exhibit 24 and finds that the evidence included in these written orders does not establish generic use by the consuming public.

69.  The Court has reviewed Exhibit DQ, which is comprised of approximately 325 pages printed out from the Internet, offered by Defendants to show that the trademark in question has become generic. Very few of these pages can be characterized as the page or website of the "relevant consuming public" and are generally inconclusive as to genericness.

70.  Exhibit DQ is not probative on the issue of whether or not the consuming public views or understands the mark to be a generic name for anti-gravity devices.

71. Defendants' exhibits and proof are inconclusive as to the primary significance of the mark in question in the minds of consumers.

72.  There is no conclusive evidence that this registered mark has been abandoned or that the mark has come to identify or describe the product itself.

### (3) Facts Relating to the Fraudulent Registration Issue.

73.  There is no proof that Plaintiffs or their attorneys withheld material information from the trademark examiner or that the amendment to the registration was obtained fraudulently or in

violation of 15 U.S.C. § 1057 (e)(a registered trademark may be amended provided that the amendment "does not alter materially the character of the mark.")

74. Information is material if the examiner would have refused the amendment had he known the information. The fact that Plaintiffs did not inform the U.S. Patent and Trademark Office of the domain name dispute or of this lawsuit is not a material omission.

75. Further, there is no proof that Plaintiffs or their attorneys intended to deceive the trademark examiner by withholding material information or that they knowingly made a false representation.

76. There is no proof that even if a primary purpose were to recover the levitron.com domain name from the Sherlocks, that the trademark examiner would not have allowed the amendment.

*(4)  Facts Relating to Naked Licensing and Promissory Estoppel Issues*

77. Defendant Michael Sherlock testified when asked if Fascinations knew he was distributing a product:  "They knew everything we were doing."  (Exhibit 7 at p.  214;  *see also id.* at  237-239; 244-246; Stipulated Fact 14.)

78. The quality of goods sold by Defendants were of the highest quality, perhaps of a quality even higher than that required by Creative Gifts.

**CONCLUSIONS OF LAW**

*II.  Jurisdiction and Relevant Law*

1. This Court has jurisdiction of Plaintiffs' federal trademark infringement and false

designation of origin claims pursuant to 15 U.S.C. §1121 and 28 U.S.C. §1338. Plaintiffs allege

violation of Section 32 of the Trademark Act of 1946, 15 U.S.C. §1114 for infringement of

Creative Gifts' U.S. Trademark Registration No. 1,896,265, as amended. (J)

2. Section 1114 provides in part as follows:

(1) Any person who shall, without the consent of the registrant--

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of

a registered mark in connection with the sale, offering for sale, distribution, or advertising of any

goods or services on or in connection with which such use is likely to cause confusion, or to

cause mistake, or to deceive; . . . shall be liable in a civil action by the registrant for the

remedies hereinafter provided. 15 U.S.C. Section 1114(1)(a). (J)

3. In order to prevail on a federal trademark claim, a plaintiff must establish both that it

has a protected interest (or trademark right) in the product or service allegedly infringed upon,

and that the defendant's usages are likely to cause consumer confusion and thus infringe upon that

interest. *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 940 (10th Cir. 1983); *Levi

Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985). (J)

4. Domain names are not exempt from trademark protection; if a user uses a mark in

connection with any goods or services in a way that is likely to cause confusion, mistake or

deception as to the affiliation, connection or association of the accused person or as to the origin

of the goods, services or commercial activities of the accused person, then that usages violates the

Lanham Act. *See* 15 U.S.C. § 1125(a)(1)(A); 4 MCCARTHY ON TRADEMARKS (4TH ED.1999) §

25:76 at 25-144 ("Should the domain name cause confusion with a senior user's mark, the

Lanham Act could be violated. In such disputes, the normal rules of trademark infringement will

apply.")


## II.  Infringement

### A.  Plaintiffs' Interest in Trademark

5.  Under the Lanham Act, "[a] certificate of registration of a mark upon the principal register ... [is] prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate, subject to any conditions or limitations stated in the certificate" (15 U.S.C. § 1057(b)), and " ... subject to any applicable legal or equitable defenses or defects."  15 U.S.C. §  1115(a).

6.  Plaintiff Creative Gifts owns the '265 registration, as amended, for the trademark LEVITRON, for a novelty item, namely, a magnetic floating top with an associated base (i.e., an anti-gravity top) with no other limitations.  The '265 registration was properly amended under Section 7(e) of the Lanham Act (15 U.S.C. §  1057(e)) from LEVITRON and DESIGN to the mark LEVITRON.

7.  By virtue of its federal registration, Plaintiff Creative Gifts has the exclusive right to use the LEVITRON mark throughout the United States in connection with anti-gravity tops, and is entitled to injunctive relief when use by another of the registered mark is "likely to cause confusion, or to cause mistake, or to deceive."    15 U.S.C. §  1114(1).

8.  Since June 1994, Plaintiff Creative Gifts, through its licensee Plaintiff Fascinations, has continuously used the mark in connection with the sale of anti-gravity tops.  This license is contained in a written agreement executed on September 15, 1995.

9.  Plaintiff Creative Gifts' mark is strong and distinctive.  The strength of a mark is evidenced by "its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source."  *See Beer Nuts, Inc.,* 711 2d. at 939.

10. Plaintiff Creative Gifts' mark has no known literal meaning in the English language, and may only be properly classified as arbitrary, fanciful, or suggestive, because the mark bears no relationship to the product with which it is associated and because imagination, thought and perception are required to reach a conclusion as to the nature of the goods. *Id.*

11.  Plaintiff Creative Gifts has a valid, protectable interest in the LEVITRON trademark.


### *B.  Likelihood of Confusion*

12.  Plaintiffs' trademark is infringed by the continued use of Defendants of the "levitron.com" domain name, because such use is likely to cause confusion in the marketplace concerning the source of any anti-gravity tops sold from that website.  *Beer Nuts, Inc.*  711 F.2d at 940.

13.  Defendants' use of  "levitron.com" constitutes trademark infringement and is in violation of the Lanham Act.  Plaintiffs have no adequate remedy at law, and have and will continue to suffer irreparable harm if Defendants continue their unauthorized use and misappropriation of the mark by precluding Plaintiffs from using the mark as an Internet domain name. Plaintiffs are, therefore, entitled to injunctive relief under 15 U.S.C. § 1116(a) against such infringement and to transfer of the levitron.com domain name to Plaintiff Creative Gifts.

14.  The public interest will be served by issuing the injunctive relief requested by Plaintiffs.

15. This conclusion of infringement is not precluded by any of the defenses asserted by Defendants.

## IV. Potential Defenses

### A. Descriptiveness

16. The mark has not become the common descriptive name of an anti-gravity top, but it has acquired a secondary meaning that would indicate Plaintiffs as the source of the goods sold in connection with the mark.

### B. Generic and Abandonment Defenses

17. Because a trademark's certificate of registration carries with it the presumption that the mark is valid, *see* 15 U.S.C. § 1057(b), a party seeking cancellation of a registration on the ground that the mark has become generic must carry the burden of proving that fact by the preponderance of the evidence. *Glover v. Ampak, Inc.*, 74 F.3d 57 (4th Cir. 1996). "The primary significance of the registered mark to the relevant public rather than purchase motivation shall be the test for determining whether the registered mark has become the generic name of goods or services on or in connection with which it has been used." 15 U.S.C. § 1064(3). Defendants have not met this burden of proof.

18. The Court is not convinced that consumers identify the mark with anti-gravity tops generally rather than with a particular product; therefore Defendants have failed to demonstrate that the mark has become a generic term for anti-gravity tops. This conclusion is based in part on the fact that the only evidence in the case indicated that all anti-gravity tops sold in the United

States originated from Plaintiffs and were Plaintiffs' products[3]. Based on this evidence, I conclude that it is with Plaintiffs' product that consumers associate the word "levitron".

19. Only by showing that the public understands by the mark the class of goods or services of which the trademarked product or service is a part can the party who seeks to cancel a registration carry its burden. *Glover,* 74 F.3d at 57 (4th Cir. 1996). Defendants have not proven that the primary significance of the mark to the relevant public is to identify the class of product or service to which the mark relates.

20. There is no evidence in the record from which I could even infer that when a purchaser sent Defendants a written order, that he or she meant to order any brand of anti-gravity top, and not specifically Plaintiffs' products. There is no evidence that the terms "levitron" and "anti-gravity top" are synonymous. There is no evidence that the public understands the word "levitron" to be a broader class of toy than that produced by Plaintiffs.

21. Defendants have not established by a preponderance of the evidence that the Levitron trademark has become generic. They have not established that the primary significance of the term Levitron to purchasers is as a generic term for a "magnetic levitating anti-gravity top". Accordingly, the registration of the mark shall not be canceled on this basis.

22. Defendants have not met their burden of proof to enable them to prevail under this defense.

23. Defendants have not established by a preponderance of the evidence that the trademark has become incapable of functioning as an indication of source.

---

[3]Upon inquiry from the Court, there was mention by one of the parties of a web site where a Korean device is or has been sold on the Internet, however there was no real specific evidence to this effect.

<u>*C. Fraudulently Obtained Trademark Amendment*</u>

24.  Defendants have not established by clear and convincing evidence a  deliberate, material attempt to mislead the Trademark and Patent Office or any reliance upon such an omission or misrepresentation.

25.  Plaintiffs did not commit fraud in the procurement of the 1997 amendment to their trademark.

26.  Plaintiffs' admitted failure to inform the Trademark and Patent Office of the domain name dispute or of this lawsuit would have a de minimus effect on the validity of the service mark. *See Five Platters, Inc. v. Purdie*, 419 F.Supp. 372, 384 (D.Md.1976)

27.  The 1997 amendment to the mark was not fraudulently obtained; this amendment is valid and may be enforced by Plaintiff Creative Gifts.


<u>*D. Implied License and Promissory Estoppel*</u>

28.  Although a trademark license agreement may be oral, written, or by implication, it is terminable-at-will by the licensor.  *See Coach House Restaurant v. Coach and Six Restaurants*, 934 F.2d 1551 (11th Cir. 1991).  Even if an implied license to Defendants were created, that license was terminated by Plaintiffs no later than August 28, 1997, when Plaintiffs' attorneys gave Defendants written notice of trademark infringement.

29.  During the time that Defendants were orally licensed to use the mark, no right, benefit or ownership interest inured to their benefit based on the fact that their advertising may have expanded the influence, recognition and/or  reputation of the mark

30.  Defendants' expenditures on advertising costs do not constitute "detrimental reliance"

19

as that term is used in a promissory estoppel context.  As a result of advertising expenditures in the range of $132,000-$140,000, Defendants realized a gross income of approximately $420,000 and consequently, a substantial financial benefit to them.

31.  Plaintiffs are not estopped by virtue of the oral license they granted to Defendants to deny Defendants any further use of the mark.


### E.  Naked License

32.  A naked license is a trademark owner's grant of  permission to use its mark without attendant provisions to protect the quality of the goods and/or services provided under the licensed mark.  If established, naked licensing results in an unintentional trademark abandonment, resulting in a loss of trademark rights against the world.  Accordingly, the burden of proving abandonment is stringent.

33.  A licensee is estopped from contesting the validity of its licensor's  mark during the term of the license agreement.  *See Pacific Supply Co-op v. Farmers Union Central Exchange*, *Inc.*,  318 F.2d 894, 908 (9th Cir. 1963).  Accordingly, Defendants are estopped as a matter of law from raising this defense for any acts or conduct prior to August 29, 1997.  Defendants raise no claim of abandonment from acts or conduct following this date**;** accordingly, the Court finds this claim to be without merit.

34.  Further, the Court concludes that there is no evidence to support Defendants' naked license argument that the licensor here maintained no control over the quality of the goods made by licensee.  The majority of products distributed by Defendants originated from Plaintiffs; the other products, mainly the videotape, were reviewed and approved by Plaintiffs.  Defendants have

asserted, undisputedly, that their limited number of products were of the highest quality.

35.   Plaintiffs exercised sufficient control over the quality of products that Defendants sold to avoid abandonment of the  mark.


*F.  Licensing*

36.   Unauthorized use of a domain name which includes a protected trademark to engage in commercial activity over the Internet constitutes use "in commerce", 15 U.S.C. § 1114(l), of a registered mark.  Such use is in direct conflict with federal trademark law.  *ActMedia, Inc. v. Active Media Int'l,*, No. 96c3448, 1996 WL 466527 (W.D.Ill. July 17, 1996).


*G.  Breach of Contract + Unclean Hands*

37.   There was no breach of contract by Plaintiffs.

38.   The doctrine of unclean hands is not applicable to the facts of this case.

**WHEREFORE,** injunctive relief and a judgment shall be entered in favor of Plaintiffs in accordance with these Findings of Facts and Conclusions of Law.

**U. S. DISTRICT COURT JUDGE**